UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT DALE RAINS, | § | |
| TDCJ # 1628958, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3664 |
| | § | |
| S. HARRINGTON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

State inmate Robert Dale Rains (TDCJ # 1628958) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the conditions of his confinement.  Doc. # 1.  Specifically, Rains complains of deliberate indifference by health care providers at the Pack Unit and the TDCJ Hospital[1] who are alleged to have denied him adequate medical care.  He also contends that the defendants violated his rights under the Americans with Disabilities Act ("ADA") by denying him medical care.

---

[1]     In a separate complaint, Rains presented similar allegations that he was denied adequate care for a serious medical need. *Rains v.Avila*, Civil No. H-12-0769 (S.D. Tex. 2012)  Rains included  some of the same health care providers in both actions. However, he also named an additional defendant, Dr. Vinod Panchbhavi.  Consequently, the Court entered an order consolidating the two actions.

At the Court's request, Rains filed a more definite statement providing additional details about his claims.  Doc. # 8.  Subsequently, the Court ordered service of process on the defendants.  The defendants submitted a Motion for Summary Judgment supported by affidavits, medical records, and other prison administrative documents.  Doc. # 32.  After reviewing all of the pleadings, records, and applicable law, the Court concludes that the motion must be **granted** and that the case must be **dismissed** for reasons that follow.

## I.    FACTUAL BACKGROUND

### A.    Chronology of Rains's Complaint and Medical History

Rains states that he has been suffering with Type 2 diabetes since 1996 and was first incarcerated in the TDCJ on March 25, 2010.  He names the following individuals as defendants: Sarah Herrington-Abke,[2] Senior Practice Manager at the Pack Unit; Dr. Fausto Avila, Medical Director of the Pack Unit; Lisa Vatani, Physician's Assistant at the Pack Unit; and Dr. Vinod Panchbhavi, Chief of Foot and Ankle Surgery, University of Texas Medical Branch ("UTMB"), Galveston Hospital.  Rains's complaint concerns the defendants' response to a foot ailment that arose as a complication of his diabetic condition.  Rains's original complaint (Doc. # 1-2, at 4-10), his more definite statement (Doc. # 8), and the complaint

---

[2]    The pleadings refer to Sarah Harrington and Sarah Abke; however, it is apparent from the defendant's affidavit that the proper name is Sarah Herrington-Abke.  Doc. #32-10.  For the sake of clarity and consistency, the defendant shall be referred to as Sarah Herrington-Abke.

filed in Civil Action No. H-12-0769 present a history of his ailments and the treatment he was given while he has been in the TDCJ system.   The Court summarizes the facts below.

Rains first was assigned to the TDCJ Gurney Unit when he was admitted into the TDCJ system in March 2012.   There, Rains was issued boots which caused a bleeding ulcer to develop on his left foot.    A Physician's Assistant ("PA") prescribed treatment but Rains lost a large piece of skin five days later.   Rains was transferred first to the Byrd Unit and then to the Estelle Unit where he was seen by another PA who treated him for cellulitis.   He was later sent to the TDCJ Hospital in Galveston where he was seen and x-rayed on May 13, 2010.   The x-rays revealed that Rains had Charcot foot[3] and that surgery was needed to correct the condition.   On June 2, 2010, Rains underwent surgery, and he was discharged the next day.

Upon discharge from the hospital, Rains was instructed to keep the dressings clean and put no weight on the affected foot.   Rains was told that he would be given crutches when he left the hospital but they were not issued until he returned

---

[3]      Charcot neuropathy is a foot condition that is most often attributed to diabetes and the loss of feeling that accompanies the disease.   It is characterized by progressive destruction of bone and soft tissue in the foot and ankle.   It usually requires attention by a foot specialist, and avoidance of weight bearing activities is often advised. *See Charcot Neuroarthropathy: An often overlooked complication of diabetes*, CLEVELAND CLINIC JOURNAL OF MEDICINE, http://www.ccjm.org/content/77/9/593.long

to Estelle.  Several days later, Rains developed an infection and was transported back to Galveston for further treatment.[4]

In mid-June, Rains moved to the Beto Unit infirmary where he underwent treatment for six months with periodic trips back to Galveston.  On October 22, 2010, the external fixator was removed, and Rains was placed in a cast.  On December 21, 2010, Rains was given a walker and was transported from the Beto Unit to the Pack Unit.

Rains broke his ankle at the Pack Unit and had to return to the hospital for more treatment.  He claims the injury occurred because he was not given a wheelchair.  On January 4, 2011, doctors operated on Rains to remove three screws that had been inserted in the June 2010 surgery that had become loose.  He was transferred to the Estelle Unit on January 11.  Rains returned to the Galveston hospital several times for a subsequent operation to fuse his ankle, but infection and swelling forced the doctors to postpone the procedure.

Rains states that he was given a wheelchair but that guards took it away on March 10, 2011, and that he was sent to the Pack Unit with a walker.  On April 7, 2011, he was sent back to Galveston where doctors again ordered a wheelchair. Rains was then sent to the Goree Unit.  On June 2, 2011, Rains underwent another

---

[4]     Rains contends that the conditions in which he was moved from Estelle to the hospital violated his constitutional rights and the ADA, but he does not identify the guards who committed the acts and does not implicate any of the named defendants.

operation in which more screws were implanted in his foot.  On July 7, 2011, Rains returned to the Galveston hospital where he was told that the doctors wanted to do a bone biopsy.  He was also told that there was no money for surgery until September.  Consequently, no biopsy was performed and no other procedure was done until an operation on October 12, 2011, when rods were implanted into his leg.  Rains contends that the rods were made necessary because he was forced to walk while awaiting surgery.

Rains claims that Herrington-Abke, Vatani, and Dr. Avila were deliberately indifferent to the pain and suffering he endured while at the Pack Unit.  He contends that they denied him x-rays, pain medication and the use of a wheelchair in late December of 2010, until he was transferred to Galveston in January of 2011. Rains asserts that the January 2011 surgery was necessary because he did not have a wheelchair.   He further complains that Herrington-Abke intentionally delayed him access to medical care because of the cost involved.  Rains contends that Dr. Panchbhavi's deliberate indifference caused serious bodily damage by delaying surgery until after September of 2011.  He seeks monetary damages and injunctive relief.

**B.**      **Defendant's Response**

**1.**      **Failure to Exhaust - 42 U.S.C. § 1997e(a)**

5

The defendants argue that Rains failed to exhaust available administrative remedies against Ms. Vatani and Dr. Panchbhavi as required by 42 U.S.C. § 1997e(a).  While acknowledging that Rains did file numerous grievances against Dr. Avila, Dr. Naik, and Ms. Herrington-Abke, the defendants contend that Rains did not mention Vatani or Panchbhavi in any of the grievances.  They dispute Rains's contention that he satisfied the requirement by filing a Step 2 Grievance against the entire department.  They first point out that the Step 2 Grievance was submitted after he filed the complaint in this action.  They then argue that the Prison Litigation Reform Act ("PLRA") requires that a prisoner identify all parties against whom they are filing a grievance.  The defendants contend that by failing to identify all parties in his grievances, Rains denied the TDCJ administration the opportunity to address all of the issues.  In support of their argument, the defendants have submitted copies of Rains's grievances filed from March, 2010, to January, 2012, marked as Exhibit A (Doc. ##32-2, 32-3, 32-4).

### 2.  **Deliberate Indifference**

The defendants further contend that the evidence demonstrates without genuine controversy that they have not violated Rains's constitutional right to medical care.  They refute Rains's claims of deliberate indifference by presenting extensive medical records documenting numerous x-rays, medications, surgeries, and other measures taken to address his ailments.  They state that Dr. Panchbhavi

6

operated on Rains on three different occasions and that Dr. Avila examined Rains and prescribed pain medication and antibiotics. They point out that Ms. Herrington-Abke, who is an administrator and not a licensed health care provider, had neither personal contact with Rains nor direct responsibility for his access to health care. Consequently, she cannot be held liable in her personal capacity. They also assert that none of the named defendants had the final authority to order a wheelchair for Rains. In addition, they state that Rains did receive a wheelchair in May of 2011. Prior to that, Rains was using a walker and crutches.

The defendants maintain that Rains has a very aggressive degenerative disorder which is difficult to treat under any circumstances. They state that Charcot Foot is susceptible to infections after surgery and is slow to heal because of the presence of diabetes, which often causes poor circulation. They assert that the delay in the ankle surgery was attributable to infection and that waiting until after the infection subsided was the only prudent course of action. They argue that no reasonable jury could find that they were deliberately indifferent to Rains's serious medical needs. They further assert that they are entitled to qualified immunity. In addition to the grievance records, the defendants have submitted the following evidence in support of their motion for summary judgment:

> Exhibit B    Relevant portions of Rains's TDCJ Health Service medical records with business records affidavit. Doc. ## 29-2, 29-3, 29-4, 29-5.

7

Exhibit C     Relevant portions of Rains's UTMB – Correctional Managed
              Care  medical records (including Dr. Panchbhavi's operation
              notes) with business records affidavit.  Doc. # 29-6.

Exhibit D      Rains's UTMB medical records for his operation on June 2,
              2010, with business records affidavit.  Doc. # 29-7.

Exhibit E     Rains's UTMB medical records for his operation on January 5,
              2011, with business records affidavit.  Doc. ## 30-2 through 30-
              17.

Exhibit F     Rains's UTMB medical records for his operation on October
              12, 2011, with business records affidavit.  Doc. ## 31-2 through
              31-10.

Exhibit G     Rains's  TDCJ  classification  records  with  business  records
              affidavit.  Doc. # 32-5.

Exhibit H     TDCJ Unit directory codes.  Doc. # 32-6.

Exhibit I     Summary and timeline of Rains's medical treatment and care.
              Doc. # 32-7.

Exhibit J     Affidavit of Dr. Steven Bowers.  Doc. # 32-8.

Exhibit J     Affidavit of Dr. Vinod Panchbhavi.  Doc. # 32-9.

Exhibit L     Affidavit of Sarah Herrington-Abke.  Doc. # 32-10.

Exhibit M     Affidavit of Dr. Fausto Avila.  Doc. # 32-11.

The records establish the following narrative regarding Rains's medical
condition and treatment:

Rains was convicted and incarcerated in Grayson County, Texas in March,
2009.  Doc. # 29-2, at 6.  His health records at the county jail documented him as
having diabetes and orthopedic problems.  Doc. # 29-2, at 6.  Rains was transferred
to the TDCJ system and first was seen by health care workers at the Gurney Unit
on March 25, 2010.  Doc. # 29-2, at 3-6; Doc. 32-7, at 3.  On March 26, 2010, he
was examined and diagnosed as having diabetes and a pre-existing wound on the
bottom of his left foot.  *Id*.; Doc. # 32-8, at 3.  Rains reported having no feeling in
his left foot and it was determined that he had a history of neuropathy which is

8

nerve damage caused by poor diabetic control.  Doc. # 29-2, at 8; Doc. # 32-8, at 3.  Insulin was ordered for Rains at that time.  He was also given crutches for two weeks and he was referred for wound care for his foot.  Doc. # 29-2, at 10.  In addition, he was counseled regarding medication and diet as well as the need for daily exercise and weight control.  *Id.* at 11.

PA Copeland examined Rains on March 30, 2010.  Doc. # 32-8, at 3.   He noted that Rains had diabetes mellitus for the last 14 years and a left foot wound.  *Id.*  Copeland ordered the following restrictions on his Health Summary for Classification (HSM-18): "Low bunk", "No lifting over 3 lbs.", "No work in direct sunlight", and "No temperature extremes."  *Id.*  Copeland also ordered lab work on Rains, finger-stick glucose checks twice each week or as needed, diet for health, a follow-up appointment with the Chronic Care Clinic in six months, and patient education to discuss his medication, diet, exercise, and weight control.  *Id.*  Soft shoes were ordered to prevent rubbing.

On March 31, 2010, Rains was seen again regarding his left foot.  Doc. # 29, at 13.  It was noted that his foot had two open areas, one at the ball of his heel and the other underneath his great toe.  *Id.*  The areas were cleaned and duoderm (skin dressing) was applied.  There is also an entry indicating that Rains was not using his crutches, complaining, "I just can't use them."  *Id.*  It was again noted

that Rains had been a diabetic for 14 years and had a left foot wound for 3 years. *Id*. at 12.

On April 6, 2010, laboratory results were returned on Rains which indicated that his glucose levels were slightly elevated.  Doc. # 32-8, at 3.  Such results indicate that Rains was at risk for neuropathy as well as for development of eye, heart and kidney disease.  *Id.*  A previous test for glucose on March 28, 2010, had returned with abnormally high levels. Doc. 29-4, at 7.

Rains was seen regarding his foot ulcerations on April 13, 2010.  Doc. # 29-2, at 15.  He complained that his foot was normally numb, but it was hurting that day.  *Id.*  The examiner noted that the foot was red and swollen with pitted edema. *Id*.  A foul odor was also noted.  *Id.*  The notes also indicated that Rains had been receiving treatment for his ulcerated foot and that he would be seen by a doctor although he was scheduled for a transfer to the Diagnostic Unit the next day.  *Id.*

PA Forsti saw Rains for a follow up examination on April 22, 2010.  *Id.* at 23; Doc. # 32-8, at 4.   It was noted that he was missing appointments due to his transient status but his location would be changed to avoid this from happening again.  *Id.*  His dressing was changed, medications were prescribed, and new orders for his wound care were entered.  *Id.*  PA Forsti saw Rains again on April 28, 2010. Doc. # 32-8, at 4.  Rains claimed that he was taking his antibiotics but had been unable to get his dressings changed.  *Id.*  Forsti noted that the foot ulcer had healed

10

over and was no longer draining.  *Id.*  He also noted that the foot was slightly warm with some redness and that Rains was wearing his TED hose as prescribed.  *Id.*

On April 29, 2010, Rains was seen in the Wound Care Clinic.  *Id.*; Doc. # 29, at 25-27.  The notes indicated that he had a peripheral keratotic (horny growth) formation on his great toe accompanied by redness, minimal swelling, and yellow watery drainage.  Doc. # 29-2, at 25.  Rains denied any pain or fever and reported that his dressings were changed daily.  *Id.*  After his wound was cleaned and treated, Rains was counseled on the importance of good glycemic control.  *Id.* at 27.  PA Forsti next saw Rains on May 3, 2010.  Doc. # 32-8, at 4; Doc. # 32-7, at 3.  Noting that Rains had recently been to the Wound Care Clinic, Forsti examined his foot and observed that it had improved and that there was no discharge since he was last seen.  Doc. # 32-8, at 4.  Forsti also determined Rains had been taking his prescribed antibiotics and ordered that the antibiotics be continued along with Naprosyn for pain relief.  *Id.*  He also prescribed a gel and dressing changes for the next four weeks.  *Id.*

Dr. Mahaffey of the Diabetic Chronic Care Clinic saw Rains on May 14, 2010.  Doc. # 32-7, at 3; Doc. 32-8, at 4.  At that time Rains appeared to be doing well and voiced no complaints.  Doc. 32-8, at 4.  However, Dr. Mahaffey noted that the latest test results indicated that the recent glucose reading was high although Rains seemed to be complying with his diet and medication instructions.

11

In response, Dr. Mahaffey increased the prescribed insulin level and scheduled a follow-up appointment in three months.

Rains was sent to the Galveston Hospital's Orthopedic Foot Clinic on May 20, 2010, because of reports of swelling and redness in his left foot after suffering an injury.  Doc. # 32-7, at 3; Doc. # 32-8, at 4.  Dr. Panchbhavi saw Rains for the first time that day and observed that his left foot was deformed due to multiple fractures in the bones and joints of the foot's midsection.  Doc. # 32-9, at 3.  After completing his examination and making a diagnosis that Rains had Charcot neuropathy in his left foot, Dr. Panchbhavi discussed with Rains the possibility of operating to stabilize the foot.  *Id.*  Although Dr. Panchbhavi was aware that Rains's foot needed attention, he also saw that it was swollen and thus informed Rains that he could not operate on him until the swelling had subsided. *Id*. at 4. Dr. Panchbhavi ordered a support boot for Rains, along a note for boots and crutches, and instructed him to return in two weeks.  *Id.*

After informing Rains of the risks and receiving his consent, Dr. Panchbhavi operated on Rains by inserting screws into the bones and installing an external frame to protect his foot on June 2, 2010.  *Id*.  Although precautions were taken, the foot developed an infection which affected the bones and soft tissue.  Doc. # 32-8, at 5.  Moreover, the presence of diabetes hampered the healing process.  *Id*. Consequently, Rains was returned to Galveston on June 8, 2010, and the next day a

peripherally inserted catheter was used so that the infection could be intravenously treated.  *Id.*  Dr. Panchbhavi, along with Dr. Allen and Dr. Mouton, infectious disease specialists, treated Rains with antibiotics from June 9 until June 15, 2010, when his infection appeared to be under control.  Doc. # 32-9, at 4.  On June 18, 2010, Rains was discharged from the hospital and transferred to the Beto infirmary for continued care and observation.  *Id.*; Doc. # 32-8, at 5.

The Orthopedics Unit conducted follow-up visits of Rains, via telemedicine, on June 30, 2010, and again August 19, 2010.  Doc. # 32-7, at 3.  Dr. Panchbhavi saw Rains on July 22, 2010, observed that there was a slight amount of drainage at the surgical pin sites.  Doc. # 32-9, at 4.  Knowing from experience that drainage was not unusual and that Rains did not have any complaints, Dr. Panchbhavi determined to continue with the antibiotic treatment and see Rains again in two weeks.  *Id*.

Dr. Panchbhavi examined Rains on August 19, 2010, and determined that the infection was increasing.  *Id.*  Dr. Panchbhavi changed the antibiotics and also had radiographs taken of the foot.  *Id.*  The radiographs revealed that one of the support screws had been bent.  *Id.* at 5.  Armed with this knowledge, Dr. Panchbhavi counseled Rains that he should not walk using the affected foot because doing so increases the risk of infection and delays the healing process.  *Id.* He then scheduled Rains for another appointment in six weeks.  *Id.*

13

Rains was returned to the hospital on October 21, 2010, because the infection had not cleared. *Id*.; Doc. # 32-8, at 5; Doc. # 32-9, at 5. The external frame was removed because of the infection and because it had served its purpose. *Id*. Rains was then placed in a cast to assist in the healing and to stabilize the foot. *Id*. He was then sent back to the Estelle Unit infirmary to recover and his leg was left in a cast until December 16, 2010, when Dr. Allen saw him again and determined that there was no gross infection. *Id*.

Rains was transferred to the Pack Unit on December 21, 2010, and Dr. Avila began treating his foot on that same day. Doc. # 32-8, at 6. Although special instructions had been issued to transport personnel on December 20, Rains complained that he was forced to climb the stairs and inclines when he spent the night at the Walls Unit during the transfer. *Id*. Dr. Avila, noting that an infection had developed, continued to treat and monitor Rains's foot the next day. *Id*. He observed that Rains was eating poorly and was nauseous and that his left foot appeared red and feverish. *Id*. Dr. Avila diagnosed Rains as having cellulitis and prescribed blood work, Cephalexin (an antibiotic), Ibuprofen, a pass for a boot, and TED hose. *Id*. He did not issue a pass for a walker. *Id*.

On December 25, 2010, an LVN saw Rains for an infection of his left foot. *Id*. Pathology reports for that date indicated that Rains had a staph infection. *Id*. Rains was given a pass to come 3 times daily for medication.  He was also given a

14

10 day prescription for Bactrim (an antibiotic) and a plastic bag to put over his foot for showering.   Dr. Avila saw Rains on December 27, 2010, and made an expedited referral to Orthopedic Surgery at Galveston noting that Rains had an infection and was on antibiotics.  *Id*.  *See also* Doc. # 32-11, at 2-3.

Dr. Panchbhavi saw Rains on December 31, 2010, and found that he had bent some of the screws in his left foot.  Doc. # 32-9, at 5.   The doctor concluded that Rains had disregarded instructions and had been walking and putting a lot of weight on his foot.   *Id.*   Dr. Panchbhavi also discovered a new problem with Rains's ankle which was related to the Charcot foot neuropathy.  Doc. # 32-9, at 5. In essence, Rains had managed to fracture his ankle due in part to his inability to feel any pain in that area.   *Id.*   In addition, the infectious disease doctors reported that Rains had a serious infection referred to as Methicillin-resistant Staphylococcus aureus ("MRSA").   *Id.*   This condition presented a dilemma for Dr. Panchbhavi.   Although he verified that Rains had fractured his ankle and needed another operation to repair it, he also realized that such an operation would increase the possibility that the MRSA infection would spread and possibly result in the need to amputate the foot.   *Id.*   Consequently, no surgery could be performed until the infection had cleared.   *Id.*   In the meantime, Dr. Panchbhavi ordered the continued use of a boot to enable Rains to protect his leg and his use of assistive equipment such as a wheelchair.   *Id.*

Dr. Panchbhavi, in an effort to save the leg, operated on Rains to remove the internal hardware on January 5, 2011.  Doc.# 32-8, at 6; Doc. # 32-9, at 6.  He removed the bent screws and put the foot in a cast.  *Id*.  By this time the bones in the foot had sufficiently healed so that the screws were no longer necessary.  *Id*.  Dr. Panchbhavi's plan at this time was to wait for the infection wounds to heal before addressing the ankle fracture.  Doc. # 32-8, at 6.  On January 11, 2011, Rains was discharged from the Galveston hospital and was transferred to the Estelle Regional Medical Facility with instructions to change the dressings twice daily, avoid pressure on the left foot, and to get a wheelchair.  *Id*.  Dr. Panchbhavi saw Rains again on January 27, 2011, and determined that the infection wounds had still not healed.  Doc. # 32-9, at 6.  He ordered that Rains continue with his antibiotic treatment.  *Id*.

Rains was returned to Galveston on March 17, 2011.  Doc. # 32-8, at 7.  Dr. Pearson, the examining physician, ordered another round of Bactrim and testing to see if Rains's liver was functioning normally and could tolerate additional antibiotics.  *Id*.  He also scheduled Rains for another appointment with Orthopedics.  *Id*.  On March 24, 2011, x-rays were taken to determine if the foot had a bone infection.  *Id*.  On March 25, 2011, Rains finished his intravenous antibiotic treatment and he was discharged from the Estelle Regional Medical Facility.  *Id*.  Dr. Pearson noted that the wound had healed, that the Infectious

Disease Unit at Galveston had recently seen Rains, and that Rains was ambulatory with a walker and that he had a 3D boot. *Id.* Dr. Allen saw Rains on March 31, 2011, and noted that his x-rays showed that there was also improved bone formation. *Id.* However, he also saw that a screw was backing out and that the mid-foot was noticeably downwardly displaced. *Id.* He also noted the presence of an infection. Dr. Allen's plan of care was no weight bearing on the left foot until further evaluation by orthopedics. He ordered crutches and a fracture boot for six months. *Id.* He also ordered that Rains be medically unassigned and restricted to a bottom bunk on a bottom cell row and scheduled him for another appointment with Orthopedics. *Id.*

On April 7, 2011, Rains was seen at the Orthopedic Clinic in Galveston. Doc. # 32-8, at 7. He was also seen by the infectious disease doctors at the Galveston hospital. Doc. # 32-9, at 6. The doctors scheduled a procedure for the left ankle once the Charcot arthropathy had improved. Doc. # 32-8, at 7. He was also ordered to have wheelchair transfers only and a walking boot. *Id.* Housing and bunk restrictions were also continued. *Id.* In addition, Rains was prescribed Tylenol #3 and scheduled for a return to the Orthopedic Unit in four weeks. *Id.* Dr. Avila agreed with the specialists' plan of care on April 12, 2011. *Id.*

Dr. Avila saw Rains on May 2, 2011, and noted that his blood sugar was increasing although he was 90% compliant with his medication. *Id.* at 8. On May

9, 2011, PA Kannenberg extended his wheelchair pass for two weeks. *Id*. The next day, Rains refused to be taken to Galveston because he was scheduled for the regular van instead of a wheelchair van. *Id.* On May 26, 2011, PA Vatani wrote orders that Rains be given a wheelchair for six months and be placed in a walking boot for the same period. *Id.* Vatani also contacted the Galveston hospital to see when Rains would be rescheduled for surgery. *Id.*

Dr. Panchbhavi saw Rains again on June 2, 2011. Doc. 32-9, at 7. He determined that the wound had healed and that there was no drainage. *Id.* Although the skin looked clear, Dr. Panchbhavi sent Rains for a bone biopsy and blood testing to determine that there was no infection in the bones before scheduling surgery to fuse the ankle. *Id.*; Doc. # 32-8, at 8.

On July 6, 2011, PA Vatani submitted an expedited referral to the Brace and Limb Clinic in behalf of Rains for evaluation for replacement of his wheelchair. Doc. # 32-8, at 8. On July 15, 2011, Rains was seen regarding his inquiry about when he would be scheduled for surgery on his ankle as well as his request for something stronger than Tylenol for his pain. *Id.* A referral was made to the Orthopedic Clinic and Rains was given a prescription for Tegretol, a medication used to manage neuropathy pain. *Id.*

On July 28, 2011, Rains was seen at the Brace and Limb Clinic for an evaluation for wheelchair replacement. *Id.* Dr. Naik, the physician with the

authority to order replacement, noted that Rains had a good right leg and good upper body strength.  He also saw that Rains was not advanced in years although Rains was wearing a 3D boot and was not bearing any weight on the left leg.  *Id.* Dr. Naik approved of a one-time repair to the wheelchair but recommended that Rains use crutches or a walker.

Rains was seen at the Orthopedic Foot Clinic on September 22, 2011, and was scheduled for surgery because his MSRA had cleared.  Doc. # 32-8, at 8; Doc. # 32-9, at 7.  On October 12, 2011, Dr. Panchbhavi operated on Rains for the third time.  *Id.*  The surgery consisted of Dr. Panchbhavi inserting a metal rod and supporting screws into Rains's ankle to stabilize it.  The surgery was successful and no infection was found when Rains had his follow-up appointment on October 27, 2011. *Id.*  On December 1, 2011, Dr. Panchbhavi saw Rains for another follow-up appointment and noted that he was recovering well and that Rains did not complain of any pain or complications from the surgery.  *Id.*

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

A movant is entitled to summary judgment if he shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).  In considering such a motion, this court construes "all facts and inferences in the light most

19

favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotations marks omitted).  For summary judgment, the movant has the burden of showing that there is an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  In doing so, the movant must establish the "absence of evidence to support an essential element of the non-movant's case."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal citations omitted).  The motion for summary judgment must be denied if the movant fails to meet this initial burden.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001).  However, if the movant does succeed in meeting this burden, the non-movant must go beyond the pleadings and identify specific facts showing that there is a genuine issue of a material fact warranting trial.  *Id.*

To prove there is an absence of evidence in support of the non-movant's claim, the movant must identify areas that are essential to the claim in which there is an "absence of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  However, the movant "need not negate the elements of the non-movant's case."  *Boudreaux v. Swift Transp. Co. Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Moreover, mere conclusions and allegations are not summary judgment evidence and cannot be used to defeat or support a motion for summary judgment. *Topalian v. Ehrman¸* 954 F.2d 1125, 1131 (5th Cir. 1992).  To successfully oppose

20

a motion for summary judgment, the non-movant must present specific facts showing "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc.*, *v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003).   If the non-movant fails to point out evidence opposing summary judgment, it is not the court's duty to search the record for such evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## III.   <u>LEGAL STANDARDS</u>

*Qualified Immunity Proof.*— The defendants have asserted the defense of qualified immunity, which is an affirmative defense which shields public officials from civil liability for acts committed pursuant to their authorized duties.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Manis v. Lawson*, 585 F.3d 839, 845-846 (5th Cir. 2009). Qualified immunity protects government employees against claims brought against them in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Wernecke v. Garcia,* 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow*, 458 U.S at 818) (internal quotation marks omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011).  This protection is extended to "'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It is applicable regardless of whether a government official's reasonable error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)).  The official is immune from suit if the law at the time of the constitutional violation does not give him fair notice that the conduct is unlawful.  *Manis*, 585 F.3d at 846 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Determining whether a public official is entitled to qualified immunity entails a two part inquiry by the reviewing court.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  First, the court must consider whether, in the light most favorable to the official asserting the defense, the official's conduct violated a clearly established constitutional right.  *Id.*  If the first part is answered in the affirmative, the court must determine whether the defendants' acts were objectively reasonable in reference to whether the right was clearly established at the time of the incident in question.  *Id.*  There is no mandatory sequence that the court must follow in applying the two parts of the qualified immunity test.  *Pearson*, 555 U.S. at 236.

***Eighth Amendment Requirements.—*** The Eighth Amendment to the Constitution prohibits treatment by custodial officials that inflicts wanton pain upon incarcerated felons or denies them the minimal civilized measure of life's

22

necessities. *Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999); *Talib v. Gilley*, 138 F.3d 211 (5th Cir. 1998). It protects prison inmates from being denied protection against conditions that endanger their basic health and medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

## IV.   ANALYSIS

### A.   Exhaustion of Administrative Remedies

Prior to filing a civil rights claim under 42 U.S.C. § 1983, a prisoner must exhaust all available administrative remedies. 42 U.S.C. § 1997e. The court can only reverse a prison's administrative decision which was made in error over an appropriate objection or grievance. *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). The TDCJ system has a two-step grievance procedure which must be completed in order to comply with section 1997e. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999). If an inmate has a complaint, he has 15 days from the date of the alleged infraction to file a Step 1 grievance with the Unit Grievance Investigator. *Johnson v. Johnson*, 385 F.3d 503, 519 (5th Cir. 2004). The inmate must then wait for a response. If the response is not satisfactory, the inmate must then file a Step 2 grievance within 15 days and wait another 35 days for a response. *Id*. at 515. To exhaust, a prisoner must pursue a grievance through both steps in compliance with all procedures. *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). A prisoner's administrative remedies are deemed exhausted when a valid grievance

has been filed and the state's time for responding thereto has expired.  *Powe*, 177

F.3d at 394.

The defendants have submitted copies of the grievances filed by Rains

regarding the complaint in this proceeding.  Doc. ## 32-2, 32-3, 32-4.  The

grievances identify Dr. Avila (Doc. # 32-2, at 3, 17); Dr. Naik (Doc. # 32-2, at 21,

Doc. # 32-3, at 1); and Ms. Herrington-Abke (Doc. # 32-4, at 4) as perpetrators of

alleged wrongs.  However, there is no mention of Vatani or Dr. Panchbhavi in the

grievances.  Without their names on the grievances, Vatani or Dr. Panchbhavi did

not have fair notice that he had a complaint against them.  *Johnson*, 385 F.3d at

522.   Consequently, Rains's civil rights complaints against Vatani and Dr.

Panchbhavi are subject to dismissal for failure to exhaust administrative remedies

pursuant to 42 U.S.C. § 1997e.   *Id*.   In addition, the record demonstrates that

neither defendant exhibited deliberate indifference to Rains's serious medical

needs as will be explained in the next section.

**B.**     **Deliberate Indifference**

The focus of Rains's claim is that the defendants denied him medical

services in violation of the Eighth Amendment of the Constitution.  His specific

complaint is that Herrington-Abke, Vatani, and Dr. Avila denied him x-rays, pain

medication and the use of a wheelchair while he was at the Pack Unit in late

December 2010 and early January 2011, and did so in order to deny Rains his right

to medical care.  He also raises the issue of whether Herrington-Abke and Vatani delayed his access to general medical services and whether Dr. Panchbhavi delayed his surgery in violation of his constitutional rights.

To assert a claim under 42 U.S.C. § 1983, the plaintiff must establish that there was a violation of a right secured by the Constitution or laws of the United States committed by a person acting under color of state law. *Doe ex rel. Magee v. Covington County School Dist. ex rel. Keys*, 675 F.3d 849, 854 -855 (5th Cir. 2012) (citing *James v. Tex. Collin Cnty.,* 535 F.3d 365, 373 (5th Cir. 2008). As a prisoner of the TDCJ, Rains has a right to basic treatment in response to his serious medical needs.  *Estelle*, 429 U.S. at 103.  He does not have a right to have the best treatment available.  *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992).  Unsuccessful treatment, even if it is the result of an occasional lapse in attention or action, does not give rise to a claim of constitutional dimensions.  *Id.*; *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).  Acts of medical malpractice, negligence or even gross negligence do not constitute deliberate indifference.  *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012); *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

To establish deliberate indifference, it must be shown that (1) the defendant was aware of facts from which he could deduce that the inmate's health was at risk

and (2) that the defendant actually drew an inference that the potential for harm existed. *See Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). There must be evidence showing that the defendant actually knew of the inmate's serious medical need or condition and disregarded it. *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). An inmate's serious medical need is one that has been diagnosed by a doctor or other health professional or one that is so obvious that even a layman would recognize that special care or attention is required when handling the inmate. *Batiste v. Theriot*, 458 F. App'x 351, 357 (5th Cir. 2012) (citing *Gobert*, 463 F.3d at 345 n.12); *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987).

The claims against Herrington-Abke, Vatani, and Dr. Avila are based on their alleged acts and omissions at the Pack Unit in late 2010 and early 2011. The court has reviewed in detail Rains's comprehensive medical history which documents his condition and treatment since he first entered the TDCJ system in March 2010. In general, the records reflect extensive efforts taken to treat Rains's diabetes and its collateral effects and belie his claims of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). Rains has failed to establish any genuine issue of material fact on the claims, as discussed below.

First, it is apparent from Rains's medical records that Dr. Avila did see and treat Rains for his ailments in December 2010. Doc. # 32-8, at 5-6; Doc.   # 29-3,

at 9-10; Doc. # 32-11, at 2-3.   He diagnosed Rains as having cellulitis and prescribed medication to fight the infection.   *Id*.   Dr. Avila also issued Rains a pass for a boot and TED hose.   *Id*.   He also ordered blood work and referred Rains to Galveston Hospital because he believed that Rains was suffering from a bone infection.   *Id*.   The evidence makes clear that Dr. Avila made earnest effort to address his patient's serious medical needs.   Regardless of Rains's opinion about medical treatment he hoped for, he presents insufficient evidence that Dr. Avila was deliberately indifferent to serious medical needs.   *Sama*, 669 F.3d at 590-91.

Similarly, the records belie Rains's allegations against Lisa Vatani. Although there is no specific reference to Vatani during Rains's layover at the Pack Unit in late December 2010, there is also no record of her denying him medical attention either.   Moreover, the records demonstrate that Rains was given adequate treatment at that time, which defeats his claim.   *Banuelos*, 41 F.3d at 235. Vatani did attend to Rains by ordering him a wheelchair as well other accommodations in May 2011.   Doc. # 32-8, at 8.   She later submitted an expedited referral to the Brace and Limb Clinic seeking an evaluation for wheelchair replacement.   *Id*.   It is noted that Dr. Naik, who is not a party to this proceeding, subsequently recommended that Rains use crutches or a walker after noting that Rains seemed capable of using them.   *Id*.   The fact that there was some disagreement among the healthcare providers as to whether a wheelchair was

necessary undermines the claim that denial of a wheelchair was an act of deliberate indifference. *Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999).   Regardless, there is no evidence that Vatani deliberately ignored a serious medical condition to Rains's detriment.

Sarah Herrington-Abke does not appear in the medical records as having any interaction with Rains.  This is due to her position as Senior Practice Manager at the Pack Unit.  Doc. # 32-10, at 2.  Herrington-Abke is an administrator and her job entails management of staffing, budgeting, and scheduling of services ordered by the doctors such as x-rays, blood work, and production of medical records.  *Id.* She does not perform any medical duties because she is not a licensed health care worker with any authority to make decisions regarding medical care.  *Id.*  Further, she does not set up appointments for visits or examinations.  *Id.*

Herrington-Abke's status as a non-health care worker permits her to defer to the actions of those who have professional training and are responsible for looking after the welfare of the inmates.  *See Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001); *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995).  Moreover, Herrington-Abke cannot be held liable because there is no evidence that she had any personal contact with Rains or was in any way directly involved with his medical care. *Anderson v. Pasadena Independent School Dist.*, 184 F.3d 439, 443 (5th Cir.

1999); *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").

The records show that Dr. Panchbhavi operated on Rains on three separate occasions.  The extensive records also show that each operation was handled with meticulous care and professionalism. *See, e.g.,* Local Observations, Dr. Panchbhavi's Operative Reports, Doc. # 29-6.  While it is evident that Rains endured a grueling series of procedures and a difficult recovery, this was the outcome of an effort to repair a difficult, deteriorating, preexisting condition. On the record presented, no constitutional violation has been shown to have been caused by any of these doctors. *See Gobert*, 463 F.3d at 346.  Plaintiff Rains has failed to raise a genuine fact issue on this claim by presenting evidence that shows that Dr. Panchbhavi or any other defendants who treated Rains was deliberately indifferent to his serious medical needs.[5]

### C.    **ADA Claims**

Rains also alleges that his rights under the ADA were violated, although he does not go to any length to explain which defendants engaged in any such violations or what specifically any defendant did that allegedly violated his rights under that statute.  Rains alleges merely that he was denied a generally available

---

[5]    At most, Rains raises the possibility that there might have been negligence in delaying some device or treatment Rains hoped for but there is no evidence that such delay caused him any harm.  None of the short delays have been shown to be evidence of deliberate indifference by a defendant to Rains's medical needs.

service or benefit based on his disability.  *Compare Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195-96 (10th Cir. 2007) (deaf inmate did not have meaningful access to jail phone services available to other inmates when communicating with his lawyer using the jail phone).  While prisoner claims are entitled to liberal construction, it is apparent that Rains has only alleged facts that support a claim of deliberate indifference allegedly in violation of the Eighth Amendment and not a separate ADA claim.

To establish a violation under the ADA, a plaintiff must show: "(1) that he is a qualified individual within meaning of ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which public entity is responsible, or is otherwise being discriminated against by public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability."  *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004) (citing 42 U.S.C. § 12131 *et seq*.).  Rains's ADA claims are not legally viable because he does not demonstrate or even allege that he has been discriminated against due to a disability.  *See Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 222 (5th Cir. 2011); *Hall v. Thomas*, 190 F.3d 693 (5th Cir. 1999).

On the record presented, the Court concludes that the defendants were not deliberately indifferent to Rains's serious medical needs.  Consequently, there is no showing of a violation of a clearly established constitutional right and the

defendants are entitled to qualified immunity and summary judgment dismissing Rains's claims.

## V.    **MOTION FOR OUTSIDE CONSULTATION**

Rains has filed a motion for evaluation by an orthopedic doctor or a podiatrist not affiliated with the TDCJ.  Although the purpose of his motion is not clear, it is apparent that Rains is dissatisfied with the medical care he has received while incarcerated and he seeks a second opinion regarding his medical diagnosis. The Court has determined that the level of care given to Rains has met the standards established under the Eighth Amendment.  Management of the inmates in custody (including their health care) is a matter within the discretion of prison officials.  *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981); *Sama*, 669 F.3d at 590-91.  This Court has no authority second-guess these decisions unless there is a constitutional or other legal violation.  *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).  Rains has not met his burden here.[6]  His medical records and the rest of the record before the Court demonstrates that Rains's needs for basic medical care have been met and there is no ground for a second opinion.  The motion for outside

---

[6]    To the extent Rains seeks funds to retain an expert to support his position, there are no funds for discovery or to compensate indigent inmates' experts. *Choyce v. Velez*, 465 F.App'x 367, 369 (5th Cir. 2012) (citing *Pedraza v. Jones,* 71 F.3d 194, 197 (5th Cir. 1995) (district court does not have authority to appoint an expert witness under 28 U.S.C. § 1915).

consultation (Doc. # 36) is **DENIED.**  *See Estelle*, 429 U.S. at 103; *Norton*, 122 F.3d at 292; *Varnado*, 920 F.2d at 321.


## VI.    CONCLUSION  AND ORDERS

For the foregoing reasons, the Court **ORDERS** as follows:

1.    The defendants' motion for summary judgment (Doc. # 32) is **GRANTED.**

2.    The plaintiff's Motion for Outside Consultation (Doc. # 36) is **DENIED.**

3.    This case is **DISMISSED with prejudice**.

The Clerk is directed to provide a copy of this Memorandum and Order to the parties.

SIGNED at Houston, Texas, on February <u>12</u>, 2013.


Nancy F. Atlas
United States District Judge